**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA ex rel.** | ) | |
| **ANTONIO KENDRICK,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| v. | ) | **No. 08 C 6281** |
| | ) | |
| **TERRY McCANN, Warden,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Respondent.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

On April 5, 2006, following a jury trial in the Circuit Court of DuPage County, Illinois,

Petitioner Antonio Kendrick was convicted on five counts of aggravated criminal sexual assault and

two counts of aggravated criminal sexual abuse, all rising from an October 1, 2003 assault and rape

of a 16-year-old girl. At the time of the offense, Kendrick was 31 years old. He is currently serving

a natural-life sentence in the Stateville Correctional Center in Joliet, Illinois.[1] His conviction was

affirmed on appeal, and the Illinois Supreme Court subsequently denied his petition for leave to

appeal ("PLA"). On November 3, 2008, Kendrick filed a petition in this court seeking federal habeas

relief pursuant to 28 U.S.C. § 2254, claiming, among other things, that the state deprived him of due

process by improperly amending the indictment against him and failed to prove his guilt beyond a

reasonable doubt.[2] For the reasons explained below, Kendrick's petition for habeas relief is denied.

---

[1]     Petitioner was sentenced to concurrent sentences of natural life for his multiple
sexual assault offenses. He was also sentenced to concurrent terms of seven years each on the
sexual abuse convictions. Those terms are to run consecutively with the natural life sentences.

[2]     Petitioner has also filed a motion for bail pending the court's consideration of his
habeas petition. (D.E. 24.) Because Petitioner is not entitled to the writ, his motion for bail is
similarly denied.

Petitioner was arrested on October 3, 2003, based on an incident two days earlier in which a 16-year-old girl–whom the court will refer to only by her initials, C.D.—alleged that Petitioner had assaulted and raped her. C.D. reported that Petitioner forced her to accompany him to a Naperville motel, slapped and threatened her, and ultimately raped and sodomized her. On October 23, 2003, a grand jury returned a 23-count indictment against Petitioner. (Rule 23 Order, Ex. D to Resp.'s Ans. at 2.) The various counts, many of which were subsequently merged, alleged several offensive sexual acts by Petitioner. The counts further alleged that the victim sustained bodily harm when Petitioner struck her about the face and buttocks and sexually penetrated her vagina. (*Id.*) In addition, the indictment noted that Petitioner had previous convictions for sexual assault, an aggravating circumstance that would elevate his sentence under Illinois law. (*Id.* at 3.) Every count in the indictment alleged that Petitioner committed sexual contact with the 16-year-old victim by "use of force." (*Id.*)

**Trial Proceedings**

Petitioner pleaded not guilty to all charges on October 27, 2003, and trial began on July 28, 2004, before Judge Robert Anderson of the Circuit Court of DuPage County. The prosecutions first witness was the victim, C.D. C.D. testified that she had been born in Liberia, but civil war in her homeland forced her to emigrate to the United States when she was 10 years old. (Trial Tr., 07/28/04 AM at 29-30.) C.D. resettled in Minnesota and lived there with her mother until 2003. In early 2003, C.D. came to live with her older sister, Seniah Jensen, in Naperville, Illinois. (*Id.* at 30-31.) C.D. met Petitioner immediately upon her arrival in Illinois; he was the person who met her at

---

[3] Absent clear and convincing evidence to the contrary, this court presumes that the factual findings of the state court are correct. 28 U.S.C. § 2254 (e); *Daniels v. Knight*, 476 F.3d 426, 434 (7th Cir. 2007). As Petitioner does not now present evidence to place the state court's findings in dispute, this court draws its factual account from the record and the Illinois Appellate Court's order affirming Kendrick's conviction. *People v. Kendrick*, No. 02-06-0473 (2nd Dist. Ill. App. April 8, 2008) (Rule 23 Order, Ex. D to Resp.'s Ans.)

the airport when she first arrived in the Chicago area.  (*Id.* at 32.)  C.D. knew Petitioner as a good friend of her sister's and a member of her church.  Born in 1987, C.D. testified that she turned 16 years old in late September 2003.[4]  (*Id.* at 33.)

On October 1, 2003, C.D. missed her school bus at the close of the day, so she went instead to the home of a friend after school.  (*Id.* at 33.)  She telephoned her sister to ask her to pick her up, but Jensen refused and told C.D. that she would have to find her own way home.  (*Id.* at 34.)  Jensen was angry that C.D. had missed her bus, C.D. testified, and she threatened to send C.D. back to Minnesota.  (*Id.* at 34-35.)  This threat frightened C.D., she testified, because she believed that it might also mean that she would be forced to return to Africa.  (*Id.* at 35.)  C.D. attempted to walk home and ultimately called a taxi.  (*Id.* at 36-37.)  When C.D. finally arrived home later that evening, her sister was out.  C.D. searched for a telephone number where she might reach her sister, and ultimately came across Petitioner's telephone number.  She called Petitioner and asked him to intercede with her sister so that Jensen would not send her away.  (*Id.* at 37-39.)  A few minutes after this conversation, C.D.'s sister called C.D. and told her she had just spoken to Petitioner, who was on his way over to the apartment to have a talk with C.D.  (*Id.* at 39.)  A short time later, C.D. went outside and met Jensen and Petitioner in the parking lot of the apartment complex.  (*Id.* at 40.)  Petitioner told C.D. to get into his vehicle and then, after he had a conversation with Jensen out of C.D.'s earshot, Petitioner returned and drove away with C.D. in the passenger seat.  (*Id.* at 41.)  When C.D. asked where they were going, she testified, Petitioner told her to shut up and announced that C.D. was "gonna take directions" from him and that "he was going to teach [her] a lesson."  (*Id.* at 41-42.)

Petitioner drove C.D. to a nearby motel. When Petitioner stepped into the office to rent a room, C.D. testified, she attempted to run from the car, but Petitioner saw her attempting to flee.

---

[4]        C.D.'s mother was also called as a witness to confirm C.D.'s age and date of birth. (Trial Tr. 07/28/04 PM at 145.)

He directed her to get back inside the car, promising that if she did so, he would drive her back to Jensen's apartment. (*Id.* at 42-43.) C.D. did return to vehicle, but, rather than take her home, Petitioner drove behind a store and stopped the car. (*Id.*) C.D. objected that where they had stopped was not Jensen's apartment, and Petitioner responded by slapping C.D. across the face, hurting her. (*Id.* at 43-44.) According to C.D., Petitioner announced that he was "gonna go back and do it right this time," and then reached over and pulled C.D.'s seat back down, pushing her into a reclining position in the car, where she remained as he drove back to the motel. (*Id.* at 44-45.)

When they reached the motel, Petitioner exited the car and walked around to the passenger side. He grabbed C.D. by the hood of her sweatshirt, she testified, and dragged her from the car into the motel room. (*Id.* at 45-46.) C.D. remembered that the room contained a chair and a bed, and that Petitioner initially instructed her to sit in the chair, while he sat on the bed adjacent to her. Very frightened at this point, C.D. told Petitioner that she was sorry for everything that had happened–a reference, C.D. explained on direct examination, to having missed her school bus. (*Id.* at 47.) Petitioner angrily replied that he was "no longer going to have this conversation," and ordered C.D. to stand up and take her shirt off. (*Id.* at 47-48.) C.D. reluctantly removed her sweatshirt and Petitioner ordered her to remove the rest of her clothing. (*Id.* at 48.) She was unwilling to do so, C.D. testified, but again complied out of fear. According to C.D., Petitioner instructed her to turn around and bend down in front of him. (*Id.* at 48-49.) When she did not bend down as far as Petitioner desired, C.D. testified, he struck her hard across the buttocks. (*Id.* at 49.) Now in pain, C.D. did as she was told and bent down further. (*Id.*) Petitioner struck her across the buttocks three more times, each time inflicting pain. (*Id.*)

After this beating, C.D. testified, Petitioner ordered her to get onto the bed. (*Id.* at 50.) He asked C.D. if she was a virgin. When C.D. responded that she was, Petitioner told her to put her finger in her vagina because, he said, he wanted her to make the vaginal opening bigger. (*Id.*) As he said this, Petitioner began to disrobe. (*Id.*) C.D. testified that she was unwilling to follow

Petitioner's instructions but again she complied out of fear. (*Id.*) She testified that it was physically painful for her to insert her finger into her vagina. (*Id.*) Once he had undressed, Petitioner inserted his own finger into C.D.'s vagina, again causing her pain. (*Id.* at 51-52.) C.D. testified that Petitioner then climbed on top of her as she lay on her back on the bed, and inserted his penis into her vagina. (*Id.* at 52-53.) C.D. screamed out in pain, and Petitioner reacted by withdrawing and telling her that she had "two choices"; she could either "fuck [him] or suck [his] dick." (*Id.* at 53-54.) Petitioner then inserted his penis into C.D.'s mouth. (*Id.*) He also placed his mouth on C.D.'s breasts and vagina. (*Id.* at 55.) Petitioner ordered C.D. to "jack him," and when C.D. said that she did not know what he meant, Petitioner placed C.D.'s hands on his genitalia and told her to "suck his penis like a lolly pop." (*Id.* at 56.) C.D. did as she was instructed, she testified, and Petitioner ejaculated in her mouth. (*Id.* at 57.) After C.D. followed Petitioner's further instruction to wash her mouth out in the bathroom sink, he finally allowed her to put her clothes back on but told her that from then on, she "was gonna be his little bitch and learn to love his dick." (*Id.* at 57-58.)

Petitioner then drove C.D. back to Jensen's apartment, dropped C.D. off in the parking lot, told her to apologize to her sister, and drove away. Immediately after Petitioner had gone, C.D. told her sister what had happened. (*Id.* at 59.) Jensen drove C.D. to the hospital, where C.D. was interviewed by medical staff and underwent a series of physical examinations. She also gave a statement to police officers. (*Id.* at 63.)

On cross examination, Petitioner's attorney asked C.D. if she was aware that Jensen—who was married and had young children—was having an affair with Petitioner. C.D. answered that she was not aware of this, but she knew that her sister and Petitioner were very close. (*Id.* at 78.) Defense counsel questioned C.D. at length about the extent to which Petitioner had used force:

Q:      Now, he didn't force you to sit in that chair [in the motel room]?

A:      Is that a question?

Q:      Yes. He didn't force you to sit in that chair?

5

A:      Force me, what way?

Q:      He didn't grab you and force you to sit in the chair?

A:      No.

Q:      And he didn't force you to take off your clothes?

A:      He made it clear to me when he was [in the car] behind the store that if I try anything stupid, he was gonna beat me like I stole something, so I was very afraid.

. . . .

Q:      You took off your clothes because he threatened to use force?

A:      Yes.

Q:      But you didn't take off your clothes because he actually used force?

. . . .

A:      He did use force.

Q:      He did not use force in having you take your clothes off?

. . . .

A:      No.

(Trial Tr. 07/28/04 PM at 10-13.) Defense counsel also elicited testimony that although Petitioner ordered her to place her finger in her vagina, he did not use actual physical force to make her do so. She testified that though Petitioner did not have his "hand around [her] throat" when he inserted his own finger into her vagina, he did use physical force to effectuate the penetration. (*Id.* at 14.) She explained that by "force," she meant the forcible manner in which Petitioner inserted his finger. (*Id.*) C.D. further stated that Petitioner had used force when he climbed on top of her and inserted his penis into her vagina, and he had stopped using force only when she began screaming. (*Id.* at 18.) Though at times confused by defense counsel's questions, C.D. was firm in asserting that Petitioner had used force in the attack:

Q:      Now, you just described the allegation of the finger in your vagina as, quote, unquote, force?

6

A:     Correct.

Q:     You remember that?

A:     Yeah

. . . .

Q:     Did you - - other - - in the same way - - other than the - - your allegation of a physical act of the penis, there was no other force concerning your vagina, right?

A:     No other force like what?

Q:     That's what I'm asking you.

. . . .

Q:     I'll try [again].  Concerning your allegation that [Petitioner] put his penis in your  - - tried to put his penis in your vagina, other than that alleged act, in other words, other than your allegation of the penis attempting to enter the vagina, there was no acts of physical force that went along with that concerning the penis and the vagina?  Do you understand my question?

A:     No.  I believe there was force because I didn't want to do it.  So, to me, that's like forced.

Q:     Were there any physical acts of force at this point, physical acts?

A:     I really don't - - I can't understand what you're saying.

Q:     When you say [Petitioner] tried to put his penis in your vagina, did he use any physical act of force against you, other than attempting to put his penis in your vagina?

A:     Yes.

Q:     And what was that?

A:     Trying to come in me, that was force.

(*Id.* at 19-20.)

Defense counsel made other attempts to impeach C.D.: he noted an inconsistency in her statements to medical personnel about whether she had washed her mouth out in the sink or shower following the assault. (*Id.* at 25.)  C.D. recalled seeing a tattoo in the shape of a band on

Petitioner's arm during the assault, but could not recall other distinguishing marks on his body, including a large tattoo on his chest. (*Id.* at 26-27.) C.D. explained that she did not want to look at Petitioner's body during the assault.

C.D. also admitted that, although she testified that Petitioner had put his mouth on her vagina, she made no mention of that when questioned at the hospital. (*Id.* at 28.) She explained that she did not feel comfortable disclosing that information to the nurses. "I was tired, so I wanted to go home," C.D. testified. "So, I made the story short. . . . I didn't feel comfortable with these people. I don't know them, and it was my first time. I've never been in a situation like this before. I was uncomfortable." (*Id.* at 29.) On redirect, C.D. testified that she did feel comfortable with Investigator Lori Chasee, a member of Kane County's Child Protection unit, to whom C.D. had given statements that were fully consistent with her trial testimony. (*Id.* at 34-35.)

The prosecutor next called Kishol Patel, the manager of the Stardust Motel in Naperville. Patel authenticated a motel registration card signed by Petitioner on October 1, 2003 and testified that the card was of the type regularly used in the course of the motel's business. (*Id.* at 50-52.) Barbara Gambino, the emergency room nurse at Edward Hospital who examined C.D. at approximately 2 a.m. on October 2, 2003, described C.D.'s demeanor at the time of the examination as "very sad" and "embarrassed" about describing her anatomy or any type of sexual activity. (*Id.* at 59-60.) Gambino testified that she took sample swabs of C.D.'s mouth, vagina, and breast area.[5] (*Id.* at 60-62.) Gambino also conducted a head-to-toe visual examination and a "point tenderness" examination, in which she touched C.D. to determine where C.D. was experiencing pain. According to Gambino, C.D. reported tenderness in her neck, her lower right abdomen, and on the inside of both of her thighs. (*Id.* at 66.) She did not report tenderness in either her face or buttocks, but she did complain of a dull ache in her vaginal area. (*Id.* at 92.) Gambino also identified a crescent

---

[5]     As described below, only the breast swab, on which Gambino found saliva, yielded any useful evidence.

shaped bloody scratch mark, roughly one centimeter by one-half centimeter, on C.D.'s upper back. (*Id. at* 66.) Gambino drew some blood and took fingernail scrapings and pubic hair combings from C.D. (*Id.* at 68-70.)

Gambino and Dr. Sunil Mathews also conducted a vaginal examination of C.D.'s genitalia and the "vaginal vault," that is, the cavity between the cervix and the outer opening of the body. (*Id.* at 74-75, 79.) They were unable to use a speculum to examine C.D., Gambino testified, because C.D. found it too painful. (*Id.* at 97-99.) A visual examination revealed that C.D. had a one-centimeter tear in her vaginal wall just before her cervix. (*Id.* at 75.) Gambino testified that the tear was consistent with an injury caused by recent vaginal penetration, and that such an injury does not occur spontaneously. (*Id.* at 77-78; 96.) Gambino noted that the vagina is a rapidly healing area of the body, meaning, in Gambino's words, that the tear in C.D.'s vault wall "must have happened very recently." (*Id.* at 78.) On cross, Gambino acknowledged that there was no way to tell exactly what caused the tear.

Gambino also testified that during an initial interview, while C.D.'s sister was present, C.D. did not disclose that she had masturbated Petitioner or that Petitioner had performed oral sex on her. When Jensen left the room, however, C.D. did tell Gambino that, although she had initially denied it, she had in fact been vaginally penetrated. (*Id.* at 109). When Gambino asked why C.D. had changed her story, C.D. explained that she was afraid that if her family found out that she was no longer a virgin, they might send her back to Africa. (*Id.*) Dr. Sunil Mathews also testified regarding the nature and placement of the tear in C.D.'s vaginal wall. He explained that any kind of tear in the vaginal wall is very unusual absent trauma. (*Id.* at 123.) In C.D.'s case, Mathews testified, the tear appeared to be consistent with vaginal penetration. (*Id.*) Mathews further testified that he saw irritation and redness near the site of the tear, and he agreed with Gambino's assessment that the tear was no more than one or two days old. (*Id.* at 124.)

The prosecutions next witness was Detective Rich Wistocki of the Naperville Police

Department, who interviewed Petitioner following his arrest on October 3, 2003.  In addition to Wistocki, Detective Steve Arp and an investigator from a local children's advocacy center were also present for Petitioner's interview.  Wistocki testified that he informed Petitioner of his *Miranda* rights, but Petitioner waived them and agreed to speak with police.  (Trial Tr. 07/29/03 AM at 126-27.) Petitioner told Wistocki that he knew Jensen, with whom he claimed to have been having an affair for about two months.  Petitioner also said that he knew C.D. and was aware of her age.  (*Id.* at 129.)  Wistocki testified that he asked Petitioner to describe what had happened on the evening of October 1, 2003.  Petitioner responded that he had received a call from Jensen, complaining that C.D. was giving her trouble and not listening to her.  (*Id.* at 130.)  According to Petitioner, Jensen asked him to speak with C.D., and he agreed to drive over to Jensen's apartment later that evening. Upon his arrival at the apartment, Petitioner told Wistocki, C.D. came down and sat in his car.  (*Id.* at 131.)  According to Petitioner, C.D. was very upset with her sister, that he and C.D. had merely driven around the apartment complex while Petitioner talked to C.D. sternly about the necessity of listening to Jensen.  (*Id.* at 132.)  Petitioner claimed to have driven in circles around the complex for about an hour and to have gone no farther than the convenience store across the street from the apartment.  (*Id.*)  After he finished lecturing C.D., Petitioner told police, he drove her back to the apartment and made her apologize to Jensen.  (*Id.* at 133.)  On his way home, Petitioner said, he got a phone call from Jensen, telling him that C.D. was very upset and was claiming that she had been assaulted.  (*Id.* at 134.)  Petitioner told Jensen that C.D. had "issues" and was not to be believed.  (*Id.*)  He also denied touching or assaulting C.D. in any way.  (*Id.*)

Up to this point in the interview, Wistocki testified, Petitioner had unequivocally denied that he had taken C.D. to a motel or had any sexual contact with her. (*Id.*)  In fact, when asked directly whether he had taken C.D. to the Stardust Motel, Petitioner had responded: "[L]ook, I'm a player. . . . [I]f I have a lady, the only hotel I go to is the Red Roof Inn." (*Id.* at 135.)  Wistocki warned Petitioner that the police possessed a signature card from the Stardust Motel, showing that

Petitioner had indeed paid for a room on the evening of October 1, 2003. (*Id.* at 135.) At this, Wistocki testified, Petitioner changed his story and said, "[O]kay, okay[,] I went into the hotel room. I went into the hotel lobby. I purchased a room, but we didn't go inside the room." (*Id.* at 136.) According to this version of Petitioner's story, he did not actually enter the motel room because C.D. was too upset to leave his vehicle. (*Id.*) Wistocki asked why Petitioner would even attempt to bring a 16-year-old girl to a motel room, but Petitioner did not answer, instead simply repeating that C.D. was "too irate and I didn't take her into the room." (*Id.* at 137.) When Wistocki told Petitioner that it was likely that motel staff actually saw Petitioner and C.D. enter the room, Petitioner finally acknowledged that it had happened: he said, "[O]kay, Okay. We did go into the room and I didn't want to, but we went in there anyways." [6] (*Id.* at 137.) Once inside the room, Petitioner recounted, C.D. pleaded with him not to let Jensen send her back to Liberia, promising in return, "I'll do anything you want me to do." (*Id.*) As she made pleas for help, Petitioner told police, C.D. was removing her clothes, placing her fingers in her vagina, and licking her fingers. (*Id.*) Petitioner acknowledged he was sexually aroused, but he refused to engage in sexual conduct with C.D. (*Id.*)

Asked whether he knew C.D. to be a virgin, Petitioner gave various answers, stating at different points in the interview that C.D. had professed to be a virgin on the evening of October 1, 2003 and that he had learned that C.D. was a virgin on a previous occasion. (*Id.* at 138-39.) When questioned about the possibility that police might find Petitioner's semen on C.D. Petitioner replied that, if semen were found, none of it would be from him. (*Id.* at 138.) Later, however, Petitioner suggested a source of his semen, he reported that C.D. had placed her hands in his pants and gripped his penis and that, as she did so, she licked her fingers. (*Id.* at 139.) Petitioner again admitted to Wistocki that he was sexually aroused by C.D.'s conduct, but he claimed that he

---

[6] All of the statements attributed to Petitioner were recounted by Wistocki during his trial testimony. The quotations referred to by this court are taken directly from the trial record of Wistocki's testimony.

resisted her advances because of the girl's age. (*Id.* at 140.) Instead, Petitioner claimed he rebuffed C.D. by grasping her arm, pushing her back, and spitting upon her. (*Id.*) When asked if he had a condom with him during the encounter, Petitioner claimed that he had in fact gone to the bathroom to put on a condom at one point, but decided he "couldn't do this" so he removed the condom and left it in the bathroom. (*Id.*) When asked specifically where he had put the condom, Petitioner testified that he could not remember. (*Id.*)

Wistocki also testified that he told Petitioner that a medical examination had discovered a tear inside C.D.'s vagina. Petitioner responded by asking "how deep" the tear was. (*Id.* at 141.) Wistocki could not answer, and Petitioner maintained that he himself had not penetrated C.D. with his fingers or penis, but pointed out that C.D. was "really putting her fingers all the way up into her vagina." (*Id.*) The encounter ended, in Petitioner's account to Wistocki, when Petitioner told C.D. that she "needed to apologize to him for playing him" and took C.D. home without having sex with her. (*Id.*)

Wistocki asked Petitioner if he would prepare a written statement of his account and then left Petitioner alone in the interview room to allow Petitioner to describe that event in his own words in writing. (*Id.* at 142.) The prosecution introduced this statement, bearing Petitioner's signature, into evidence. Petitioner's written account substantially tracks the final version of events that Petitioner had told Wistocki, reading in part:

> [A]fter getting into the [motel] room [C.D.] stumbled and became irate cursing about me. I tell her well forget about it. I can't talk to you so you're going to be going back to Africa. Then I said let's go. After that [C.D.] became very apologetic and saying that she would do anything if I talked to her and I convinced her [sister] not to send her back to Africa. . . . While she was talking she walks toward the bed and starts undressing. She takes off all her clothes while talking. She climbed onto the bed and starts playing with herself, first with one finger then with two. It looks as if she was trying to stick her whole hand in then. . . . At that point I am tripping. It's I can't believe this at all, so I am quiet. She then asked me do I have a condom and I say yes. At this point I go into the bathroom to put it on. But just as quickly as I put it on I took it off because I couldn't believe I had allowed her to manipulate me like that and I could not compromise my friendship with her family not over stupidity. So I left out the bathroom. . . .

(*Id.* at 146-49.)  After giving his statement, Petitioner consented to a mouth swab.  (*Id.* at 150.)
Wistocki acknowledged that, because the room at the Stardust Motel had already been cleaned,
police found nothing of evidentiary value there, and there was no evidence of any semen on C.D.'s
body.  As Douglas Saul of the DuPage County Sheriff's Laboratory testified, however, the saliva
sample taken from C.D.'s breast matched Petitioner's DNA.  (Rule 23 Order, Ex. D to Resp.'s Ans.
at 18.)

Illinois evidentiary rules permit the introduction of evidence of propensity to commit sex
crimes.[7]  As its final witness, the state called Robin Monger, the victim of a 1992 rape for which
Petitioner was convicted and sentenced to 10 years in prison.  Monger testified that Petitioner had
raped her on December 20, 1992, when she was a 17-year-old freshman in college.  (Trial Tr.
07/29/03 PM at 102.)  She testified to the facts of that incident as follows: Monger and Petitioner
were teammates on a college track team.  After arriving at the college one night following a meet,
Petitioner offered Monger a ride home.  First, however, he took her to his room, where he said he
needed to retrieve his car keys.  Once there, Petitioner attempted to kiss Monger and unzip her
pants.  Monger told him to stop, but Petitioner pushed her onto a bed.  Monger began crying and
unsuccessfully tried to stop Petitioner from removing her clothes.  Petitioner said that he just

---

[7]     Section 7.3 of the Illinois Code of Criminal Procedure, 725 ILCS 5/115-7.3, like
Federal Rule of Evidence 413, permits the introduction of evidence relating to earlier sex-based
offenses in related cases.  In this case, the state sought to introduce evidence of several prior
incidents in which Petitioner had been accused or convicted of sexual assault. In addition to the
1992 rape of Ms. Monger, Petitioner had pleaded guilty to aggravated assaults in three separate
Tennessee cases in October 1997.  (Rule 23 Order, Ex. D to Resp.'s Ans. at 4.)  In yet another
Tennessee case, also from 1997, Petitioner was convicted on an additional aggravated rape charge
and sentenced to 20 years imprisonment.  This last conviction was subsequently reversed on
appeal and remanded for a new trial, but Petitioner fled the jurisdiction during the pendency of the
case.  (*Id.*)  The trial court permitted the introduction of evidence relating to the 1992 rape and
conviction, but excluded evidence of the other offenses.  (*Id.*)  The court also granted Petitioner's
motion to bar any reference to his fugitive status and to exclude his statements to police about
whether his prior offenses had resulted in convictions.  (*Id.*)

wanted to "play" with Monger and did not want to "fuck" her.[8] (*Id.* at 110.) Monger screamed, but Petitioner covered her mouth. A struggle ensued, but Petitioner ultimately held Monger down and stuck his fingers into her vagina. He then penetrated her vagina with his penis. After the rape, Petitioner allowed Monger to get dressed and asked Monger if she hated him. Monger did not reply. According to Monger's testimony, Petitioner warned then told her that she had "pretty lips" and asked whether she had ever "sucked dick." (*Id.* at 115-16.) Again, she did not reply. According to Monger, Petitioner warned her that if she "tried anything stupid," she might "just have to learn." (*Id.*) Finally, Monger told Petitioner that she hated him, cursed at him, and demanded that he never touch her again. Monger testified that, in response, Petitioner threatened to make her "life a living hell" or even "take her out" if she were to report his conduct–the trial court in C.D.'s case ultimately instructed the jury to disregard the portion of Monger's testimony in which she described the threats that Petitioner made against her. (*Id.* at 118-19) After threatening her, Monger testified, Petitioner forced her back onto the bed. She screamed and resisted, but Petitioner threw her against the wall and, after another struggle, raped her a second time. The jury in the case involving C.D. also learned that Petitioner had served his sentence for this 1992 crime. After presenting Monger's testimony, the state rested.

Petitioner called C.D.'s sister, Seniah Jensen, as a witness for the defense. Jensen denied that C.D. had moved to Naperville because of any behavioral problems. On the evening in question, Jensen testified, she was disappointed that C.D. had not come home on time and had indeed threatened to send C.D. back to Minnesota, but nevertheless claimed she was not angry with C.D. for having missed the bus. (*Id.* at 205-07.) Petitioner called Jensen and reported that C.D. had called him and told him that Jensen was angry with her and had threatened to send C.D. back to Minnesota. (*Id.* at 208-09.) According to Jensen's testimony, Petitioner told Jensen not

---

[8]    Again, the statements attributed to Petitioner regarding the 1992 incident come from Monger's testimony in C.D.'s case, and the court quotes exclusively from the trial record.

to "make any hasty decisions" and asked for Jensen's permission to speak with C.D. before Jensen

punished her.  (*Id.*)  Jensen agreed.  She testified that she had known Petitioner since 2002;

acknowledged that she had been engaged in a sexual relationship for about two months in late

2002.  (*Id.* at 209-10.)  When C.D. returned home after meeting with him, Petitioner on October 1,

2003, Jensen testified, C.D. told Jensen that Petitioner had raped her.  (*Id.* at 212.)  Jensen

admitted that she did not immediately call the police, but instead called Petitioner, who denied any

wrongdoing.  Jensen testified that she then drove C.D. to the hospital.

Two additional defense witnesses also testified: Naperville Police Officer Christopher

Sherwin testified that Jensen had told him that C.D. had moved to Naperville because of her earlier

behavioral issues.  Petitioner's employer, Pamela Campbell, testified to the circumstances of

Petitioner's arrest.[9]  The defense then rested.  Petitioner did not testify.

At the close of the evidence but prior to closing arguments, the state moved to amend the

indictment as to each of the counts against Petitioner.  Specifically, the indictment charged that

Petitioner had accomplished each charged offense by "use of force"; the state sought to add the

words "or threat of force" to each count.  (Trial Tr. 08/02/03 at 37.)  Over Petitioner's objection, the

trial court granted the motion.  (*Id.* at 38-43.)  Judge Anderson noted that the pattern jury

instructions for the charged offenses used the words "by use of force or threat of force" and

explained  that the amendment was, in his view "a very minor, trivial, and indeed a formal change."

(*Id.* at 43.)  The judge also explained that he did not believe Petitioner had suffered any prejudice

as a result of the amendment.  (*Id.*)

In its closing, the state argued that Petitioner had sexually assaulted C.D. by use and threat

of force and without her consent:  "[Petitioner] threatened [C.D.], struck her numerous times in the

---

[9]     Petitioner was arrested at the barbershop where he worked by as many as six
Naperville Police Officers.  It appears that Petitioner sought to introduce evidence that he
cooperated fully with law enforcement and to suggest that his surprise (and intimidation) may have
been the source of the inconsistencies in the statements he made to police.

buttocks. Struck her in the face, and ordered her to do all of these things forcefully. And bear in mind, this is a defendant who is an adult with a 16-year-old girl with whom he has been entrusted." (*Id.* at 82.) The prosecutor also emphasized that Petitioner had changed his story multiple times during his interview with police. In contrast, the prosecutor argued, C.D. had immediately reported the incident, and her version was corroborated by the physical evidence: the motel registration card and the saliva on C.D.'s breast containing Petitioner's DNA were consistent with C.D.'s description of events. In urging the jury to convict, the prosecutor also noted the similarities between C.D.'s account and the 1992 assault described by Monger.

During its closing, the defense argued that C.D. was a disrespectful and insolent girl who attempted to seduce Petitioner. Although Petitioner admitted that he was tempted to the point that he "let that girl touch his penis," defense counsel asserted, Petitioner never did have sex with C.D. (*Id.* a t 105.) In support, defense counsel pointed to the fact that no semen had been found on C.D.'s body or at the scene. Defense counsel argued that the saliva was consistent with Petitioner's story; Petitioner had told police that he spat upon C.D. when he refused her sexual advances. Defense counsel further pointed out that C.D. did not initially tell hospital staff that Petitioner had put his mouth on or penetrated her vagina. Nor did C.D. describe the tattoo on Petitioner's chest. These shortcomings, defense counsel argued, fatally undermined C.D.'s credibility. Counsel asserted that Petitioner himself had initially lied to the police because he feared that his criminal record would be held against him regardless of his innocence.

Defense counsel also argued that the government had failed to satisfy its burden of proof as to force or bodily harm. He contended that C.D. had admitted that Petitioner had not used force against her. The fact that C.D. claimed to have been hit on the buttocks, defense counsel urged, did not constitute actual injury. Counsel suggested, further, that the injury to C.D.'s vagina was caused either by her own fingers or by some other sexual activity that C.D. had engaged in before meeting with Petitioner. In rebuttal, the prosecutor noted that Petitioner had slapped C.D. and

threatened to beat her if she did not obey him. The trial court instructed the jury using to Illinois's

pattern instructions, and the jury deliberated and found Petitioner guilty on all counts. (*Id.* at 177-

79.)

**Petitioner's Post-trial Proceedings and Direct Appeal**

Following the verdict, Petitioner moved to dismiss the indictment based on the fact that the

prosecutor had erroneously told the grand jury that oral swabs taken from C.D. had tested positive

for the presence of semen. (Rule 23 Order, Ex. D to Resp.'s Ans. at 23.) Petitioner was appointed

a new attorney on October 14, 2004, and subsequently filed two additional motions for a new trial.

Following a series of hearings, the trial court denied Petitioner's motions, concluding that any

misrepresentation by the state before the grand jury was unintentional and did not prejudice

Petitioner. (Trial Tr. 04/06/05 at 6-7.) The court sentenced him to concurrent natural-life terms of

imprisonment. (Rule 23 Order, Ex. D to Resp.'s Ans. at 24.)

Petitioner appealed his conviction on several grounds. First, he argued that the amendment

to the indictment violated his due process rights because it altered the substantive elements of the

charged offenses. The Illinois Appellate Court, Second District, rejected this argument, noting that

the charging statutes referred to in the indictment explicitly defined the offenses as being committed

"by the use of force or threat of force." (*Id.* at 25.) (quoting 720 ILCS 5/12-13(a)(1)). In the court's

view, the addition of the phrase "or threat of force" to the indictment was a mere formal correction,

and, as such, the amendment was permissible under Illinois Supreme Court precedent. Citing the

Illinois Supreme Court's ruling in *People v. Jones*,[10] the appellate court reasoned that the addition

of "or threat of force" did not substantively alter or broaden the scope of the indictment or prejudice

---

[10] In *Jones*, the Illinois Supreme Court held that the amendment of an indictment, which had charged that defendant's conduct created "a strong probability of death," to state that defendant's conduct "created a strong probability of death *or great bodily harm*" was not a substantive alteration in the indictment. *Jones*, 219 Ill. 2d at 35, 845 N.E.2d at 616 (emphasis added).

Petitioner.  219 Ill. 2d 1, 35, 845 N.E.2d 598, 616 (2006).  The court further found that the indictment was sufficiently specific to inform Petitioner of the charged offense and to allow him to prepare his defense.  (Rule 23 Order, Ex. D to Resp.'s Ans. at 28.)

Petitioner also asked the court to reverse his conviction based on the prosecutor's false statement to the grand jury regarding whether traces of semen had been found on C.D.  The appellate court determined, however, that "the evidence support[ed] the trial court's findings that the inaccurate evidence regarding the testing of oral swabs was not an intentional attempt to mislead the grand jury," and that the subsequent conviction by the petit jury without the tainted evidence cured any error.  (*Id.* at 33.)  Petitioner also presented arguments based on the sufficiency of the evidence and the effectiveness of trial counsel, but the state appellate court concluded that these arguments lacked merit and affirmed Petitioner's conviction.  Petitioner filed a PLA with the Illinois Supreme Court, which the court denied on September 24, 2008.  (Order Denying PLA, *People v. Kendrick*, No. 10-66-05 (Ill. 2008)) (Ex. F Ex. D to Resp.'s Ans.)  Petitioner did not file a petition for *certiorari* to the United States Supreme Court.  Nor did he seek state post-conviction review.

**Petitioner's Request for Habeas Relief**

On November 3, 2008, Petitioner filed the instant petition for habeas relief in this court, pursuant to 28 U.S.C. § 2254.  He claims that: (I) he was denied due process because his indictment was unfairly broadened following the presentation of evidence; (ii) the charging instrument failed to provide Petitioner with adequate notice of the charges against him; (iii) the evidence presented was insufficient to sustain his conviction; (iv) he was denied his right to a speedy trial, in violation of due process; (v) the state permitted prosecutorial misconduct in that the prosecutor lied to the grand jury; and (vi) his attorney was ineffective.  (Pet. at 1-32.)  Kendrick is now entitled to consideration of only those constitutional issues that he has previously provided the state courts with an opportunity to resolve "by invoking one complete round of the state's

18

established appellate review process." *Byers v. Basinger*, 610 F.3d 980, 985 (7th Cir. 2010) (*quoting O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). The court addresses each of his claims below.

## **DISCUSSION**

Under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), this court will grant habeas relief only where the decision of the state court was "contrary to or involved an unreasonable application of clearly established Federal law" or was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(1-2) (2000). A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law; [or] if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the United States Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court's decision is an "unreasonable application" of clearly established federal law when the state court clearly identifies the correct legal rule but applies that rule unreasonably. *Williams*, 529 U.S. at 407. "An unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 410. To be an "unreasonable application," the state court's decision must be "well outside the boundaries of permissible differences of opinion." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir.2002). This court views Kendrick's petition with this extremely deferential standard in mind.

### Claim I - The Amendment to the Indictment

Petitioner first contends that the addition of the phrase "or threat of force" to the various counts of his indictment constituted an impermissible expansion of the indictment's scope. Petitioner characterizes this supposed expansion as a violation of his due process rights and the

equal protection clause.[11]  The constitution requires that the allegations contained in an indictment match the proof at trial.  *See United States v. Trennell*, 290 F.3d 881, 888 (7th Cir. 2002).  This requirement insures that the defendant is not subject to a second prosecution and gives the defendant reasonable notice so that he may prepare his defense.  (*Id.*)  For this reason, "only a grand jury, and not a trial court, may materially amend a criminal indictment."  *United States v. Field*, 875 F.2d 130, 133 (7th Cir. 1989).  Not all amendments to an indictment are *material*, however, and courts are permitted to amend indictments to address matters of form or surplusage.  *Id.* (citing *United States v. Muelbl*, 739 F.2d 1175, 1179 (7th Cir. 1984)).  "In general, amendments to an indictment will be allowed to stand if they do not 'change an essential or material element of the indictment so as to cause prejudice to the defendant.'" *Id.* (quoting *United States v. Cina*, 699 F.2d 853, 857 (7th Cir. 1983)).

In reviewing Petitioner's claims, the Illinois Appellate Court found that the addition of the phrase "or threat of force" was a formal rather than material change and that Petitioner did not incur prejudice as a result of the alteration.  (Rule 23 Order, Ex. D to Resp.'s Ans. at 26.)  These conclusions are neither contrary to nor an unreasonable application of clearly established federal law.  As the state court correctly observed, the statute under which Petitioner was charged uses the language "force or threat of force" and defines those terms in tandem.  See 720 ILCS 5/12-12(d).[12]  The Illinois sexual assault statue defines force as including  "when the accused threatens

---

[11]     Petitioner does not explain why he believes the amendment violates the equal protection clause.  Consistent with its obligation to construe *pro se* petitions broadly, however, the court considers whether *any* of Petitioner's constitutional rights were potentially infringed as a result of changes made to the charging instrument.

[12]     Petitioner characterizes "or threat of force" as an "essential element" of his sexual assault charges.  (Pet. Rep. at 25.)  This characterization, however, is based on an erroneous understanding of the charging statute.  The Illinois law does not treat "force" and "threat of force" as separate elements of the same crime.  Rather, the terms are used simultaneously to describe a single element that has a consolidated (and somewhat redundant) definition.  The precise language of 720 ILCS 5/12-12(d) is as follows:  "'Force or threat of force' means the use of force
(continued...)

20

to use force or violence on the victim." *Id.* Thus, the state court reasonably concluded that the addition of the "threat of force" language merely made explicit a concept that was already implicit in the indictment's use of the term "force." *See, e.g., People v. Smalley*, 43 Ill. App. 3d 600, 602, 357 N.E. 2d 93, 94 (1st Dist. 1976) ("In fact, in the rape context the communication of a threat of force is inherent in the use of force.") The amendment did not alter or expand the scope of the indictment and did not implicate Petitioner's constitutional rights. *Cf. U.S. ex rel Hindson v. Walls*, No. 02 C 3784, 2005 WL 1323346, *17 (N.D. Ill. May 31, 2005) (no constitutional violation where an amendment to the indictment replaced a charge with a new charge containing the same elements).[13] Petitioner is not entitled to relief on this claim.

**Claim II - Sufficiency of the Charging Document**

In a second challenge to the charging document, Petitioner suggests that the omission of the words "or threat of force" to the original indictment prejudiced his defense. Because the indictment did supply Petitioner with fair notice of the alleged offenses, the court rejects this argument, as well.

The U.S. Constitution requires that fair notice be given to the criminally accused: no one may be held criminally responsible for conduct that the average person could not reasonably understand to be proscribed. *Lemons v. O'Sullivan*, 54 F.3d 357, 363 (7th Cir. 1995) (citing *United*

---

[12](...continued)
or violence, or the threat of force or violence, including but not limited to the following situations: (1) when the accused threatens to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believed that the accused had the ability to execute that threat; or (2) when the accused has overcome the victim by use of superior strength or size, physical restraint or physical confinement."

[13]    In his reply, Petitioner also asserts that the state failed to comply with Illinois procedural rules governing the form and amendment of criminal charges. 725 ILCS 5/111-3; 5/111-5. A federal court on habeas review, however, does not instruct the state courts as to how to apply their own state rules and statutes. Rather, the court reviews the actions of the state court to determine only whether Petitioner "is in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). Unless Petitioner's procedural complaints implicate a due process right under federal law, they simply cannot be a basis for habeas relief.

*States v. Harriss*, 347 U.S. 612, 617 (1954)). To that end, "an indictment charging an offense must: '(1) state all of the elements of the offense charged; (2) inform the defendant of the nature of the charge, enabling the defendant to prepare a defense; and (3) enable the defendant to plead the judgment as a bar to later prosecution for the same offense.'" *Id.* (quoting *United States v. F.J. Vollmer & Co., Inc.*, 1 F.3d 1511, 1518 (7th Cir. 1993)). The validity of an indictment is subject to the general requirements of the Fourteenth Amendment, and "a last-minute change in the charge could prejudice a defendant's opportunity to defend himself; if that prejudice is severe enough, a due process violation could occur." *See Tague v. Richards*, 3 F.3d 1133, 1141 (7th Cir. 1993); *Bae v. Peters*, 950 F.2d 469, 478 (7th Cir. 1991).

Petitioner has suffered no prejudice in this case. The indictment explicitly alleged that Petitioner had engaged in multiple acts of unconsented-to sexual contact with C.D., a minor, "by use of force." (Rule 23 Order, Ex. D to Resp.'s Ans. at 29.) The charges were specific as to the offenses alleged, the identity of the victim, the location of the incident, and the specific acts of alleged sexual contact. The indictment further stated the essential elements of each offense by alleging that the acts were effectuated through Petitioner's "use of force" and describing the specific "bodily harm" suffered by C.D. This level of detail was more than sufficient to give Petitioner notice as to the nature of the charges against him and to enable him to mount a defense at trial. Petitioner has not demonstrated how his defense theory—i.e. that C.D. herself initiated the sexual contact and that Petitioner rebuffed her advances—would have differed had the indictment been amended to include the words "or threat of force" at an earlier stage.[14] Rather, even before the amendment,

_____

[14] In his reply brief, Petitioner asserts that this defense theory was "foisted upon [him] by the Court and the State." (Pet. Rep. at 7.) The record, however, demonstrates that this contention is false. Instead, Petitioner's theory was "foisted" upon him by his own inculpatory statements following his arrest: in his initial interview with police, Petitioner admitted that he had taken C.D. to a motel room, that he had watched C.D. stick her fingers inside her vagina, and that C.D. had touched his genitalia. As a result of these admissions, Petitioner's defense was limited to his contentions that (1) he had rebuffed C.D.'s sexual advances before things went further and
(continued...)

22

Petitioner's defense theory necessarily encompassed the contention that Petitioner neither *used* nor *threatened* force to effectuate the offending sexual contact. The addition of the words "or threat of force" to the indictment did nothing to undermine Petitioner's defense.

In an attempt to explain how his defense might have differed had the indictment been amended earlier. Petitioner speculates that he might have cross-examined C.D. more aggressively or subpoenaed more witnesses to impeach C.D.'s testimony. (Pet. Rep. at 7-8.) The incentive for Petitioner to rigorously challenge C.D.'s testimony, however, existed prior to and throughout the trial and was unaltered by the amendment to the indictment. C.D. explicitly testified that Petitioner both used and threatened force against her, and Petitioner was well aware before trial that C.D.'s version of events contrasted dramatically with his own account. The record demonstrates that C.D.'s credibility was the centerpiece of the state's case and that defense counsel did, in fact, aggressively attempt to impeach her testimony. The fact that the jury deemed C.D.'s testimony to be credible does not support the conclusion that Petitioner suffered any prejudice in preparing or presenting his defense. *See Tague*, 3 F.3d at 1141 (no due process violation where the petitioner "fail[ed] to demonstrate how his defense would have differed had the [charging document] been amended earlier."); *Barger v. State of Indiana*, 991 F.2d 394, 397 (7th Cir. 1993).

In this case, neither the charge nor the alleged facts have changed as a result of the amendment to the indictment, and this court cannot conceive of a way in which Petitioner's right to notice has been violated. The average person reasonably understands that engaging in non-consensual and/or forcible sexual contact is proscribed under the law. The charging document correctly stated the essential elements of the charged offenses, and Petitioner has made no showing that he lacked notice of the charges or that the wording of the indictment somehow

---

[14](...continued)
(2) that C.D. had engaged in these sexual contacts volitionally and not as a result of any threatened or actual force exerted by Petitioner.

prejudiced his defense at trial.  As a result, Petitioner is not entitled to relief on this claim.

**Claim III - The Sufficiency of the Evidence**

In Claim III, Petitioner asserts that the state failed to meet its burden of proof on the issue of force.  Under Illinois law, determining whether a defendant used force to commit a sexual assault requires a circumstance-specific inquiry.  *See People v. Smith*, 32 Ill.2d 88, 92, 293 N.E.2d 879, 882 (1965) ("There is no definite standard fixing the amount of force required [under Illinois law] and each case must be considered on its own facts. . . . [I]t is not necessary [for the victim to resist] under circumstances where resistance would be futile and would endanger the life of the female, nor where she is overcome by superior strength or paralyzed by fear.")  Due process in a criminal proceeding requires that the government establish a defendant's guilt by proof beyond a reasonable doubt.  *See In re Winship*, 397 U.S. 358, 361-62 (1970).  *Jackson v. Virginia*, 443 U.S. 307, 324 (7th Cir. 1970).  Petitioner has shown no violation of this standard here.  Rather, as is evident from the record, the Illinois courts correctly applied the reasonable doubt standard and the prosecutor produced sufficient evidence to support the jury's verdict.  (Rule 23 Order, Ex. D to Resp.'s Ans. at 40.)

To meet its burden, the prosecution offered C.D.'s testimony that Petitioner struck her, threatened to severely beat her, and forced her to have sex with him against her will.  This testimony by itself is sufficient to support the jury's verdict.  C.D. testified that Petitioner acted aggressively and made several menacing comments toward her.  Petitioner's threats and ominous statements, C.D. testified, frightened her.  She initially attempted to flee, but Petitioner lured her back to his car, slapped her across the face, and forcibly pushed her into a reclining position in her seat.  He warned her that he was planning to "teach [her] a lesson" and threatened to beat severely if she tried "anything stupid."  Such acts of violence and explicit threats are, of course, relevant to the jury's consideration of Petitioner's subsequent sexual contact with C.D.  *See, e.g., People v. Gramc*, 181 Ill. App. 3d 729, 736-37, 537 N.E.2d 447, 452 (5th Dist. 1989) (evidence that an

24

assailant threatened his victim with a knife during an earlier assault supported the jury's finding that force existed where the victim did not attempt to flee or resist during a subsequent assault) *appeal denied,* 1127 Ill.2d 626, 545 N.E.2d 120 (1989).

Immediately after striking and threatening C.D., Petitioner drove to a motel, where he dragged C.D. from the car by the hood of her sweatshirt. Inside the motel room, Petitioner made a series of demands, struck her additional times across the buttocks, and forcibly inserted his fingers and penis into her vagina, along with other sexual acts. When C.D. screamed, Petitioner told her she had "two choices": oral or vaginal sex. Medical experts testified that C.D. suffered a trauma-related tear to her vaginal wall of recent origin. In addition, motel records confirmed that Petitioner had indeed rented a room, and DNA testing of saliva recovered from C.D.'s breast corroborated C.D.'s testimony that Petitioner had licked her breast.

The state also produced evidence that Petitioner had previously committed a sexual assault against a young woman, and the details of that earlier crime were substantially similar to the details as recounted by C.D., even down to the type of language and threats Petitioner used during the assaults. Petitioner's own inconsistent and incriminating statements to police further supported the inference that Petitioner had assaulted C.D. and lied to police in an attempt to avoid criminal responsibility. He changed his story several times in attempts to explain the damning evidence that police confronted him with. Not surprisingly, Petitioner could offer no legitimate reason for bringing a 16-year-old girl to a motel room. The jury's decision to credit C.D.'s testimony was reasonable, the evidence was sufficient to support the jury's verdict, and the state appellate court's affirmance on this basis was neither incorrect nor unreasonable. Petitioner's claim for relief is denied.

**Claim IV - Right to a Speedy Trial**

Petitioner's fourth claim revisits his objection to the alleged amendment to the indictment: he contends that his speedy trial rights were violated because his own motions for continuance related only to the initial indictment as unamended. Respondent contends that this claim is

procedurally defaulted, and the court agrees.

Proper exhaustion for habeas purposes requires that a prisoner fully and fairly present his constitutional claims in at least one full round of state-court review before seeking federal redress. *See Johnson v. Hulett*, 574 F.3d 428, 431 (7th Cir. 2009). To do so, the prisoner must articulate both the operative facts and applicable law that he claims entitles him to relief. *Id.* While Petitioner did raise a "speedy trial" argument before the Illinois courts, he made reference exclusively to rights provided for under Illinois statute rather than any comparable right in the federal constitution. (See Pet. Br. at 11.) Petitioner did not rely on any federal or state cases involving a constitutional analysis. Rather, his argument before the state appellate court relied exclusively on Illinois cases applying the Illinois Speedy-Trial Act, 725 ILCS 5/103-5(a). *See People v. Williams*, 204 Ill.2d 191, 197, 788 N.E.2d 1126, 1131 (2003). As Respondent correctly points out, the Illinois Supreme Court has recognized that the state's Speedy-Trial Act bestows "an additional statutory right" that is distinct from the rights guaranteed by the Sixth Amendment and Due Process Clause of the federal constitution. *People v. Van Schoyck*, 232 Ill.2d 330, 335, 904 N.E.2d 29, 31 (2009). Thus, Petitioner's articulation of his speedy trial claim before the Illinois courts did not "call to mind" a constitutional right in a manner that fully and fairly afforded the state court with an opportunity to address the constitutional claim. *See Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001).

Petitioner's speedy trial claim is procedurally defaulted. Even if it were not, however, the claim lacks merit. As explained above, the amendment to the indictment did not create a new charge or materially alter the existing charges against Petitioner. The delay attributable to Petitioner, therefore, applies with equal force to the charges as subsequently amended. Petitioner's own motions for continuance acted as a waiver of his speedy trial rights with respect to both the pre- and post-amendment indictment. His claim is denied.

**Claim V- Prosecutorial Misconduct**

In Claim V, Petitioner complains that the prosecutor's misrepresentation to the grand jury

about the recovery of semen from C.D.'s body violated Petitioner's due process rights.[15]   In a hearing on this matter, the prosecutor in the case admitted that he mistakenly informed the grand jury that swabs taken from C.D. had tested positive for semen.   The prosecutor explained that he had confused the evidence in this case with evidence in another pending sexual assault prosecution.   The trial court concluded that the state did not deliberately misrepresent the evidence to the grand jury and that ample other evidence supported the indictment, and the state appellate court affirmed these conclusions.   (Rule 23 Order, Ex. D to Resp.'s Ans. at 40.)   As an initial matter, Petitioner does not now present any cause to doubt the trial court's factual finding with respect to the prosecutor's intent.   This alone dooms his claim; a prisoner is not entitled to habeas relief based solely on a prosecutor's unintentional misstatement before a grand jury.   *Cf. Shore v. Warden, Stateville Prison*, 942 F.2d 1117, 1122 (7th Cir. 1991) (to constitute a due process violation, the use of perjured testimony before the grand jury must be "knowing and intentional.").

Grants of habeas relief for errors committed in grand jury proceedings are extremely rare for several reasons.   First, there is no federal constitutional right to be indicted by a grand jury in a state court prosecution.   *See Alexander v. Louisiana*, 405 U.S. 625, 633 (1972).   In addition, the existence of a subsequent conviction by a petit jury (which is almost always the case on habeas review) defeats the conclusion that an error before the grand jury prejudiced the petitioner.   *See, e.g., United States v. Mechanik,* 457 U.S. 66, 70 (1986) ("[T]he petit jury's subsequent guilty verdict means . . . that [the defendants] are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt."); *United States v. Lang*, 644 F.2d

---

[15]     Respondent urges that the court reject this claim as procedural defaulted.   The court's review of Petitioner's state appeal, however, demonstrates that Petitioner invoked his due process right and alleged a pattern of facts regarding prosecutorial misconduct such that the constitutional claim was fairly presented to the state court.   This court therefore opts to address the claim on its merits.

1232, 1236 (7th Cir. 1981) ("Because the grand jury does not finally adjudicate guilt or innocence, it has traditionally been allowed to pursue its investigative and accusatorial functions unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial.")

In this case, the petit jury found Petitioner guilty beyond a reasonable doubt without hearing or relying on the misstatements that Petitioner now complains of. Those misstatements are, as a matter of law, harmless beyond a reasonable doubt: the evidence presented to the petit jury was undoubtedly sufficient to support Petitioner's indictment because it was sufficient to support Petitioner's conviction under the reasonable doubt standard. Thus, Petitioner can show no prejudice and his claim based on error or misconduct before the grand jury must fail.

**Claim VI - Ineffective Assistance of Counsel**

Though he raised numerous grounds for his ineffective assistance claim before the state court, Petitioner now limits his ineffective assistance claim to a single ground. (Pet. Br. at 25.) He contends that his counsel was rendered ineffective by failing to seek dismissal of the indictment following its amendment. (*Id.*) Because, as the state court found, the indictment was "not defective," any such objection would have been futile. (Rule 23 Order, Ex. D to Resp.'s Ans. at 55.) As a result, the state court concluded, Petitioner could not show prejudice based on his counsel's failure to object. (*Id.*) Petitioner calls this state court decision "arbitrary and discriminatory" and a "complete contradiction," but this court sees nothing arbitrary or contradictory in the state court's ruling. (Pet. Br. at 25.) Rather, the ruling appears to fully comport with established federal law.

In order to establish ineffective assistance of counsel, a petitioner must establish that: (1) his attorney's performance fell below an objective standard of reasonableness, and (2) he suffered prejudice as a result. *Wyatt v. United States*, 574 F.3d 455, 457-58 (7th Cir.2009) (citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 693, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984)). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Benefiel v.*

28

*Davis*, 357 F.3d 655, 661 (7th Cir. 2004). In several cases, the Seventh Circuit has explained that, where there is no underlying violation, defense counsel's objection or motion would have been futile, and a petitioner cannot show prejudice. *Id.* at 664 ("[C]ounsel cannot be faulted for failing to register a futile objection."); *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004) ("[C]ounsel could not be viewed as ineffective for failing to present [a futile motion]."). As the state court appropriately comprehended, that is exactly the case here. The amendment of the indictment was proper and did not prejudice Petitioner's rights. Defense counsel was under no obligation to lodge a futile objection and his failure to do so had no impact on the outcome of Petitioner's trial. Petitioner's claim for relief is denied.

## **CONCLUSION**

Petitioner Kendrick's petition for habeas corpus [1] and his motion for bail [24] are denied. The case is dismissed.

ENTER:

Dated: September 8, 2010

_____

REBECCA R. PALLMEYER
United States District Judge